IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:09-CR-18 |
| Plaintiff, | : | Chief Judge Susan J. Dlott |
| vs. | : | ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS |
| MARK PATE, | : | |
| Defendant. | : | |

This matter comes before the Court on Defendant Mark Pate's Motion to Suppress Evidence (doc. 14). The Court held a hearing on the motion on May 27, 2009 that was continued in progress and completed on July 23, 2009.[1] The Government filed a post-hearing memorandum in opposition to Defendant's motion (doc. 29), and Defendant filed a reply in support (doc. 30).

Pate is charged with one count of being a felon in possession of a weapon in violation of 18 U.S.C. § 922(g). Pate moves to suppress the firearm discovered and the statements he made on the morning of September 10, 2008 on grounds that they were obtained in violation of his Fourth Amendment rights. Specifically, Pate contends that the traffic stop that eventually led to the discovery of this evidence was invalid because the officer did not have reasonable suspicion that Pate was violating Ohio's law requiring that a vehicle's license plate be illuminated. For the reasons that follow, Defendant's motion is **GRANTED**.

---

[1] The court reporter prepared a transcript of the testimony presented at the May 27, 2009 hearing. (Doc. 25, hereinafter "Hrg. Tr.".)

**I.     FACTUAL BACKGROUND**

The two police officers present at the scene of Pate's arrest, Officer Dan Bemerer and Officer Ken Thomas, testified at the suppression hearing. Three other witnesses testified at the hearing[2] but not about the specifics of Pate's arrest. Therefore, the following factual account regarding the arrest is drawn from the officers' testimony, unless otherwise noted.

On the morning Pate was arrested, Officer Bemerer was on patrol with a canine partner. Bemerer was driving southbound on Reading Road in a marked police car when an Infiniti pulled out of a parking lot and turned south onto Reading Road approximately fifty yards in front of him. Bemerer testified that the Infiniti's license plate light was burned out and that he could not read the license plate. He testified that he used the motor data computer ("MDC") inside his police car to alert another officer, Officer Thomas, that a vehicle with this "equipment violation" was coming his way.[3]

---

[2] Other persons to testify at the suppression hearing were Jamie Bryant, Pate's acquaintance and the owner of the Infiniti; Kara Killen, investigator for the Federal Public Defender's Office; and a records custodian for the Regional Crime Information Center.

[3] Although Officer Bemerer testified that MDC stands for "motor data computer," (hrg. tr. 9:11), counsel referred to the device as a "mobile data computer." Officers use their MDCs to obtain information about persons and vehicles from the Regional Crime Information Center ("RCIC"). RCIC maintains a police information system within Hamilton County, Ohio. Walter Kruer, information technologist and records custodian for RCIC, testified at the hearing about how the RCIC system works. When an officer enters information such as a license plate or driver's license number into an MDC, RCIC receives the query. RCIC then produces a report of information from its database, and the information is sent back to the officer's MDC. This process usually takes 15 seconds but can take several minutes. If an officer enters a license plate number into the MDC, the officer receives information about the registered owner of the car.
    The RCIC log of the activity from Bemerer's and Thomas' MDCs on the morning of September 10, 2008 was entered into evidence at the hearing on the motion to suppress as Defendant's Exhibit 1. It is not evident from the RCIC log whether Bemerer sent an alert to Thomas regarding a vehicle with an equipment violation.

Officer Thomas, meanwhile, was stationary in a marked police car in a parking lot adjacent to Reading Road some distance south of Bemerer's location. Thomas was entering the license plate numbers of passing vehicles on Reading Road into his MDC. In the midst of running license plate numbers, Thomas also was trying to fix the window in his police car because it had broken. The RCIC log shows that Thomas ran the license plate number EHS5888 at 12:42 a.m. (Def. Ex. 1.) EHS5888 is the license plate number of the Infiniti. Thomas ran another license plate at 12:43 a.m. and another at 12:44 a.m. (*Id.*)

Thomas testified that while he was in the parking lot, he received a message from Bemerer that there was a vehicle coming his way with a license plate light violation.[4] Thomas testified that he was so preoccupied with fixing his window that he did not pay any attention to the vehicle that then passed him. He did, however, see Bemerer pass. Thomas then pulled out of the parking lot onto Reading Road and proceeded south on Reading to assist Bemerer in the traffic stop.

Bemerer testified that while he was following the Infiniti, he quickly turned off his headlights and then turned them on again. He testified that he always does this to check whether there is a light illuminating a license plate before he initiates a traffic stop. Bemerer then activated his patrol vehicle's overhead lights and the Infiniti pulled over and came to a stop. Bemerer's testimony regarding when he entered the Infiniti's license plate information into his MDC was inconsistent. On direct examination, Bemerer testified that he stopped the Infiniti and *then* "tried to run the query of the vehicle before [he] approached it." (Hrg. Tr. 10:14-20.) He

---

[4] The RCIC log does not indicate whether or when Thomas received an alert from Bemerer regarding an Infiniti with an equipment violation. (Def. Ex. 1.)

testified that he "did not get anything back [from RCIC] so [he] approached the vehicle." (*Id*.) On cross-examination, Bemerer testified that he ran the tag on the Infiniti while he was following the car, a couple of minutes *before* he initiated the stop. (*Id*. at 31:17-22, 32:1-9.) The RCIC log shows that Bemerer ran the license plate number of the Infiniti at 12:43 a.m. (one minute after Thomas ran the same license plate). The RCIC report shows that Bemerer received information about the Infiniti at 12:43 a.m., immediately after he made the query. (*Id*.) The RCIC report shows that the Infiniti was registered to a female named Jamie Bryant.

Bemerer approached the driver's side door of the Infiniti and asked the driver for his license and insurance. Bemerer did not inspect the vehicle's license plate light when he approached the car. When the driver, later identified as Defendant Mark Pate, gave Bemerer his driver's license, Bemerer smelled a strong odor of raw marijuana. Bemerer went back to his patrol car and ran an MDC records check of the driver's license. The MDC report identified Pate and revealed an open warrant for his arrest for a traffic violation. The MDC report also showed that Pate had a history of weapons charges and felony drug violations.

At this point, Thomas had arrived at the scene of the stop. Bemerer returned to the Infiniti and asked Pate to step out of the vehicle, and Thomas approached the passenger side of the Infiniti. Thomas testified that he could smell a strong odor of marijuana in the vicinity and it appeared to be coming from the vehicle.

Bemerer asked Pate to step to the rear of the vehicle and place his hands on the car for a pat-down. When Pate moved his hands from his midsection to the car trunk, Bemerer saw something fall to the ground. Bemerer did not look at the fallen item right away, but when he did, he saw that it was a marijuana cigarette. Thomas also saw an object drop from Pate during

4

the pat-down. Bemerer then asked Pate for his consent to search the Infiniti. Pate responded: "What is your probable cause?"

Bemerer placed Pate in the rear of Thomas' patrol car. While Pate was in the patrol car, Bemerer and Thomas searched the Infiniti; Bemerer searched the driver's side and Thomas searched the passenger's side. Although Bemerer had a drug-sniffing canine in his police car, he did not conduct a canine search of the Infiniti. Thomas opened the glove box and observed a loaded firearm inside. The officers did not find any marijuana in the vehicle.

After the officers searched the Infiniti and found the firearm, Bemerer went back to Thomas' police car and read Pate his *Miranda* rights. Pate denied any knowledge of the gun and said that the Infiniti belonged to his girlfriend. The officers then returned to the Infiniti to further their search of the vehicle. The officers opened the car's trunk and found a gun case inside. Officer Thomas again gave Pate his *Miranda* warnings and asked him again about the gun. Pate responded that he did not know the gun was in the car and that the gun belonged to his sister.

Officer Thomas arrested Pate for the offenses of having a weapon while under disability, carrying concealed weapons, and possession of marijuana. (Gov't Ex. 4.) Thomas also wrote Pate a citation for violating Ohio law requiring a license plate light, Revised Code § 4513.05. (Def. Ex. 3.) Thomas never looked at the license plate light of the Infiniti; he wrote the citation based on what Officer Bemerer told him. Bemerer then impounded the Infiniti. Bemerer did not take any photographs of the car at the scene or at the impound lot.

Approximately nine months after Pate's arrest, an investigator with the Federal Public Defender's Office examined the Infiniti with tag number EHS5888, which was being stored in

Pate's garage. After dark, the investigator pulled the Infiniti to the darkest area of the street, stood fifty feet back from the rear of the vehicle, and observed the license plate. The investigator testified that the license plate was illuminated and that she could see the numbers on the plate. When she observed the Infiniti up close, the investigator saw that the plate was lit by not one but two separate light bulbs, each in separate casings, located directly above the license plate.

Jamie Bryant, the owner of the Infiniti and an acquaintance of Pate, testified that she saw the Infiniti the night of Pate's arrest and that the license plate lights were functioning.

## II.    ANALYSIS

Defendant Pate moves the Court to suppress the evidence and statements obtained on the morning in question on grounds that the stop of the vehicle was without reasonable suspicion and that his arrest was conducted without a warrant or probable cause. He also argues that the search of the vehicle was made without a warrant or any valid exception to the warrant requirement. The Government contends that the stop, search, and arrest were constitutional and that the evidence should not be suppressed.

### A.    Applicable Standard

"Stopping and detaining a motorist 'constitute[s] a "seizure"' within the meaning of the Fourth Amendment even if 'the purpose of the stop is limited and the resulting detention quite brief.'" *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). According to Sixth Circuit jurisprudence, a stop made on the basis of an ongoing traffic violation is justified under the Fourth Amendment if the officer initiating the

stop has reasonable suspicion to believe that the motorist has violated the traffic law. *United States v. Simpson*, 520 F.3d 531, 541 (6th Cir. 2008).

Officer Bemerer testified that he stopped the Infiniti because the license plate light was not illuminated in violation of Ohio Revised Code § 4513.05. That statute provides in pertinent part:

> Either a tail light or a separate light shall be so constructed and placed as to illuminate with a white light the rear registration plate, when such registration plate is required, and render it legible from a distance of fifty feet to the rear. Any tail light, together with any separate light for illuminating the rear registration plate, shall be so wired as to be lighted whenever the headlights or auxiliary driving lights are lighted, except where separate lighting systems are provided for trailers for the purpose of illuminating such registration plate.

*Id*. A violation of the statute is a misdemeanor offense. Ohio Rev. Code § 4513.99. Because driving a vehicle without a light illuminating the rear registration plate would be an ongoing criminal traffic violation, *Simpson* dictates that reasonable suspicion is the applicable standard. The parties agree that the reasonable suspicion standard applies to the facts of this case.

### B. Reasonable Suspicion to Stop

"An investigative stop of a vehicle is permissible under the Fourth Amendment where the stop is supported by reasonable suspicion of wrongdoing." *United States v. Flores*, 571 F.3d 541, 544 (citing *Terry v. Ohio*, 392 U.S. 1, 22 (1968)). "Reasonable suspicion must be 'supported by articulable facts that criminal activity "may be afoot," even if the officer lacks probable cause.'" *Id*. (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). "The court should consider the 'totality of the circumstances' and evaluate whether the detaining officer had

7

a 'particularized and objective basis' for suspecting wrongdoing." *Id*. (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

In this case, the Court must determine from the testimony whether Officer Bemerer had a particularized and objective basis for suspecting that Pate was violating Ohio law, specifically, that the Infiniti he was driving did not have a light "constructed and placed as to illuminate with a white light the rear registration plate . . . and render it legible from a distance of fifty feet to the rear." Ohio Rev. Code § 4513.05. Defendant advances two arguments for why the testimony adduced at trial fails to satisfy this standard.

Defendant's first argument goes toward statutory construction. Defendant suggests that Ohio Revised Code § 4513.05 requires only that the rear registration plate be legible from a distance of fifty feet from the rear and that the illuminating light is not required so long as the plate is otherwise legible. Defendant states that under such a reading of the statute, Officer Bemerer could not have reasonably believed that the statute was being violated because Bemerer was able to run the Infiniti's license plate before he stopped the vehicle, a fact which indicates that the plate was legible from a distance of fifty feet.

The plain language of the statute contradicts Defendant's suggested interpretation. The statute states that a light shall be placed "as to illuminate . . . the rear registration plate . . *and render it legible*." Ohio Rev. Code § 4513.05 (emphasis added). Therefore, even if the Infiniti's plate was legible because it was being lit by another source, such as Officer Bemerer's headlights, the statute is violated if the plate is not illuminated by a light placed on the vehicle for the purpose of illuminating the plate.

Defendant's second argument for why Officer Bemerer did not have reasonable suspicion that Pate was violating Ohio Revised Code § 4513.05 is that Bemerer's testimony regarding the license plate was inconsistent and contradicted by other witnesses. Pate is correct that the testimony given at the hearing on the motion to suppress was inconsistent. The bottom line, however, is whether the testimony was sufficient to establish that Officer Bemerer had an objectively reasonable suspicion that Pate was committing the crime of having an unilluminated license plate. The standard is not whether the officer is *certain* that a crime is occurring; the standard is whether the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry*, 393 U.S. at 21.

Several facts elicited at the hearing on Defendant's motion cast doubt on whether the Infiniti's license plate was unilluminated. First, Officer Thomas ran the Infiniti's license plate while he was sitting in a parking lot adjacent to Reading Road. According to both officers' testimony, Officer Bemerer notified Officer Thomas that a car was coming toward him with a license plate violation. Officer Thomas was thus fully aware that he should be on the lookout for such a violation. However, Officer Thomas testified that he never saw a vehicle with an unilluminated license plate go by. Meanwhile, the RCIC report proves that Officer Thomas not only saw the Infiniti go by, he ran its license plate number. This begs the question: how could Officer Thomas, who was in a parking lot adjacent to the road, read the Infiniti's license plate to put the number into his MDC if it was not illuminated? Further, if he was specifically on the lookout for a plate violation, how could he have failed to observe such a violation if, in fact, one existed on the Infiniti?

9

Officer Bemerer's inconsistent testimony also raises questions. Officer Bemerer testified that he could not read the Infiniti's license plate when the car pulled out in front of him because the license plate light was burned out. (Hrg. Tr. 21:12-21.) However, Officer Bemerer then testified that he entered the plate numbers into his MDC while he was following the Infiniti. (*Id.* at 31:17-22.) If Officer Bemerer was able to run the license plate as he was following the vehicle, the license plate had to have been legible from at least the distance between Officer Bemerer's cruiser and the Infiniti. This also begs a question: how was Officer Bemerer unable to read the Infiniti's plate number when the vehicle pulled out in front of him but was able to read the plate number moments later while he was following the Infiniti? Whether Officer Bemerer was able to read the license plate as he was following the Infiniti because the plate was being illuminated by the headlights of the officer's patrol car, or by overhead street lights, or by some other illumination source was not addressed during the hearing. In short, Officer Bemerer testified that he could not read the license plate, but yet he entered the plate number into his MDC before he made the stop.

While the inconsistencies in the testimony raise questions about what Officer Bemerer actually observed, the stop is valid if there is evidence to show that Officer Bemerer had a "particularized and objective basis for suspecting wrongdoing" when he stopped Pate. *Flores*, 571 F.3d at 544. During his direct examination, Officer Bemerer succinctly stated that "[a] license plate light was burned out." (Hrg. Tr. 8:19-24.) During his cross-examination, Officer Bemerer elaborated on the basis for his belief that the license plate light was out. The pertinent testimony is as follows:

> Q. Now, after you stopped the vehicle, you indicated you approached the driver's side of the vehicle where Mr. Pate was sitting?
> A. Correct.
> Q. You did not at that time go up and look closely at the license plate?
> A. No. I – what I do before I turn – before I pull the vehicle over, I will turn off my headlights to make sure that there is no lights coming from that vehicle prior to stopping – initiating a traffic stop.
> Q. Okay. So is that what you did on this occasion?
> A. Yes. That's what I do all the time.

(Hrg. Tr. 33:10-21.)

Officer Bemerer did not describe any particulars about the specific incident involving Pate. He did not state how far he was from the Infiniti when he turned off his headlights, whether any other lights on the Infiniti were illuminated or not, whether he turned his headlights on and off more than once, or any other facts specific to Pate or the Infiniti. To the contrary, he described the situation as being like every other occasion on which he pulled over a vehicle.

The Court finds that the evidence presented by the Government does not demonstrate that Officer Bemerer had a "particularized and objective basis" for suspecting Pate of wrongdoing. The only factual evidence presented by the Government with respect to the illumination of the license plate was not sufficiently particularized to this case. Rather, the testimony about this incident was indistinct from what Officer Bemerer does "all the time." In the absence of testimony concerning specific facts particular to the officer's decision to stop Pate, the Court cannot conclude that the Government met its burden of establishing that the officer had an objective and particularized basis for suspecting Pate of wrongdoing.

Adding further support to this conclusion is the fact that neither officer inspected the license plate area to see whether there were any lights illuminating the plate. Officer Thomas,

11

who wrote the citation, admitted that he never even looked at the license plate. (Hrg. Tr. 76:3-7.) Neither officer photographed the vehicle either before or after it was impounded. Other than Officer Bemerer's bare testimony that the plate was illegible (which is contradicted by the fact that he then ran the tag number into his MDC) and that he turned off his headlights as he does "all the time," there is no evidence that the Infiniti's tag light was burned out.

In addition, Officer Bemerer's testimony that the plate was not illuminated was directly contradicted by the testimony of two other witnesses. Jaime Bryant, the vehicle's owner, testified that she observed the lights affixed to illuminate the plate on the morning of Pate's arrest and that they were functional. The Federal Public Defender's investigator testified that she inspected the Infiniti several months after the arrest and observed that the Infiniti had two separate lights affixed so as to illuminate the plate and that both were functional, rendering the plate legible from a distance of fifty feet. The totality of the evidence shows that it was not objectively reasonable for Officer Bemerer to believe that the Infiniti's license plate was not illuminated such that it was not legible from a distance of fifty feet to the rear as required by Ohio Rev. Code § 4513.05.

Having determined that Officer Bemerer did not have reasonable suspicion to stop the vehicle in the present case, the Court need not undertake further inquiry into the validity of the Pate's subsequent arrest and search of the vehicle. The stop was unlawful from its inception, and all evidence seized and statements subsequently obtained are fruits of the unlawful stop and must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 485 (1963).

## III. CONCLUSION

For the reasons stated above, Defendant's Motion to Suppress (doc. 14) is **GRANTED**.

IT IS SO ORDERED.

                                              s/Susan J. Dlott
                                              Susan J. Dlott
                                              Chief Judge, United States District Court